# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GERALD WILLIAMS-BEY, | : |
| | : CIVIL ACTION |
| Plaintiff, | : |
| | : |
| v. | : No. 18-05096 |
| | : |
| PHILADELPHIA HOUSING | : |
| AUTHORITY, et al., | : |
| | : |
| Defendants. | : |

Goldberg, J.                                                                                                   February 20, 2020

## MEMORANDUM

Plaintiff Gerald Williams-Bey filed this action, *pro se*, against Defendant the City of Philadelphia ("City"), the Philadelphia Housing Authority ("PHA"), and individual Defendants Branville G. Bard and Glenn Eskridge (collectively, "Defendants").[1] Defendants now seek dismissal of the Complaint under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, I will grant the Defendant PHA's Motion to Dismiss the punitive damages claim against the PHA and against Defendants Bard and Eskridge in their official capacities. The Motions will be denied in all other respects.

## I.    FACTUAL BACKGROUND

The following facts are taken from Plaintiff's Amended Complaint:[2]

---

[1]     Plaintiff also sued Defendant Vanessa C. Hall, but never properly effected service of either the Complaint or Amended Complaint upon her, despite a Court order directing Plaintiff to do so. Rule 4(m) of the Federal Rules of Civil Procedure provides that service of the summons and complaint is to be made upon a defendant within ninety days after the filing of the complaint. As the Amended Complaint was filed on February 25, 2019 and Defendant Hall has yet to be served, the case against her shall be dismissed for lack of prosecution.

[2]     In deciding a motion under Federal Rule of Civil Procedure, the court must accept all factual allegations in the complaint as true, construe the complaint in the light most favorable to the

1

Plaintiff's claims stem from an ongoing and escalating dispute with a neighbor, Vanessa C. Hall. Plaintiff, a registered sex offender under Megan's Law, has resided in his home located at 2136 N. 19th Street Philadelphia, PA, since May 2016. He and his spouse, Jennifer Bennetech, are an interracial Muslim couple and live at the home with their two young children. Plaintiff's property is bordered, on one side, by a privately-owned vacant lot. On the other side of the vacant lot sits a home owned by Defendant PHA, which, at the time of the incidents, was occupied by Hall and six of her seven children. (Am. Compl. ¶¶ 1–4.)

According to the Amended Complaint, in May of 2016, Hall began "what would become of cycle of non-stop hate[-]based harassment" against Plaintiff and his spouse. To address the intensifying situation with Hall, Plaintiff and Ms. Bennetech went to their local Councilwoman's office and spoke with staff member John Fenton, who indicated that he would contact the Philadelphia Housing Authority. (Id. ¶¶ 5–8.) After this meeting, Plaintiff and his family were harassed not only by Hall, but by PHA police as well. For example:

- On June 3, 2016, Plaintiff was pulled over by a PHA officer on non-PHA property because somebody reported a domestic incident between Plaintiff and his wife.

- PHA maintenance vans with PHA police in them began sitting on the block between 5:30 a.m. and 7:00 a.m., which was when Plaintiff regularly got his coffee from the corner store.

- On Saturday, June 11, 2016, Hall screamed at Ms. Bennetech from her front steps saying, "hey, white girl you really want to play these games, you got way more to lose than me, you already know I'm connected." According to the Amended Complaint, Hall "became more comfortable and bold with harassing [Plaintiff's] family after P.H.A Police and property management became involved."

- On Sunday, June 12, 2016, Plaintiff and his family were barbecuing, while Hall sat on her steps and recorded the family with her phone for hours. Hall's adult daughter attempted to instigate a fight with Ms. Bennetech.

---

plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief. Atiyeh v. Nat'l Fire Ins. Co. of Hartford, 742 F. Supp. 2d 591, 596 (E.D. Pa. 2010).

- Hall continued to make religious and race-based comments and told Plaintiff, "you wanna f[–-] with me, you on that list I'll say you touched me or my kids."

(Id. ¶¶ 10, 12, 13, 15, 16, 19.)

In mid-June, Plaintiff filed a neighbor dispute complaint with the Philadelphia Commission on Human Relations. A mediation, scheduled through PHA, proceeded on June 15, 2016, with Plaintiff and his wife, as well as Hall and her son, in attendance. The two presiding PHA community relations officers allowed Hall to slander Plaintiff and his wife throughout the mediation without permitting any response. Ultimately, the officers concluded that the mediation was useless and told Ms. Bennetech to call them if anything else occurred. (Id. ¶¶ 18–20, 23–24.)

The following day, Plaintiff and his wife went to PHA's Office of Audit and Compliance to complain about both Hall and the mediation process. They were referred to Branville Bard, Jr., the Chief of the PHA's Police Department. During a subsequent meeting, Chief Bard indicated that he was the former Captain of the Philadelphia Police Department's 22nd Police District—which was the police district in Plaintiff's neighborhood—and that he had recently left the District to join the PHA. Chief Bard told Plaintiff he was going to have Detective Sgt. Glenn Eskridge look into the matter. Plaintiff alleges that although Chief Bard was fully aware that PHA police jurisdiction was limited to the grounds and buildings of the PHA, he never informed Plaintiff of that fact and never referred Plaintiff to City police. According to the Amended Complaint, Chief Bard used his position to protect Hall and assist her in harassing Plaintiff. (Id. ¶¶ 26–30.)

On the morning of June 17, 2016, Sgt. Eskridge called Ms. Bennetech and told them he would be conducting an "investigation." Plaintiff was unaware that this "investigation" would be used to vest total control of the situation in the PHA and prevent Plaintiff from turning to Philadelphia Police for assistance. Plaintiff was also unaware that the investigation would "protect Miss Hall from being held accountable for her actions." (Id. ¶ 34.)

After the investigation was opened, Hall became "confident and relentless" in harassing Plaintiff and his family  She would threaten Plaintiff and then call PHA police, who would, without further inquiry, yell at Plaintiff.  When Plaintiff sought help from the Philadelphia Police Department, he was repeatedly told that, because of the ongoing investigation by the PHA, he had to contact PHA police.  (Id. ¶¶ 35–37.)

The harassment from both Hall and the PHA police continued:

- On July 1, 2016, Hall had her ex-boyfriend approached Plaintiff in front of his home.  Later that day, PHA police asked Plaintiff if he threatened the man from next door.  When Plaintiff said that the man had approached him on his own property, PHA police told Plaintiff to go in the house and he "won't have to worry about stuff like that."

- In late July, Hall's juvenile and adult sons pounded on Plaintiff's door threatening to fight and/or kill Plaintiff and his wife.  Ms. Bennetech called 911 in an effort to get Philadelphia Police, but PHA police responded and did nothing.

- In late August, Hall hung a newsletter on the front of her home that said "this is the year of jubilee" and something about "defeating enemies in the name of Jesus."  The next morning, Plaintiff found human feces smeared into his wall with a pile of feces on the ground.  Plaintiff reported it to PHA, but Sgt. Eskridge said they could not be sure it was Hall.

- When Plaintiff and his wife came home from meeting with Sgt. Eskridge, Hall began taunting them saying, "oh you went to Eskridge you mad as shit ain't you," and "oh yal Muslim I don't like yall people anyway."  Hall threatened to call child services and get Plaintiff's kids taken away.  Hall's adult daughter said she wanted to taste Ms. Bennetech's blood.  When PHA police were called to the scene, they treated Plaintiff and his wife as the aggressors, despite contrary videos and neighbor testimony.

(Id. ¶¶ 39, 41, 43, 44.)

Plaintiff sought assistance from the Philadelphia District Attorney's Office, where he was again told to contact PHA police due to their ongoing investigation.  Plaintiff then recontacted Fenton, who set up a meeting with Shanna Moore, the Community Relations Officer for the 22nd Police District.  Plaintiff and his wife subsequently met with Ms. Moore, who informed them that Chief Bard had promoted her and "that she loved Chief Bard," and then told Plaintiff that there was not much she could do due to the pending PHA police investigation.  (Id. ¶¶ 45–48.)

On two occasions in August 2016, Plaintiff and his wife went to PHA's Office of Audit and Compliance to complain about the actions of PHA police. On the first trip, they spoke with someone, who agreed to take a complaint about Hall, but not about the police. On their second visit, the PHA officer simply ordered them to leave. (Id. ¶ 50.) In mid-August, Plaintiff and Ms. Bennetech came home to have lunch to find Hall out front of her home with PHA police. The officers "aggressively" said Plaintiff damaged Hall's property. When Plaintiff went to the PHA police to complain about the officers, he was told to file a "right-to-know" request. (Id. ¶ 51.)

From August to October, both Hall and PHA police continued to relentlessly harass Plaintiff and his family. Another "feces" incident occurred on August 24, 2016. When Plaintiff went to the PHA police station to speak with Sgt. Eskridge, the officer on duty pushed Plaintiff and told him to leave the building. On October 5, 2016, Hall's ex-husband went to Plaintiff's house yelling that they must "stop f[–-]ing with his kids." Shortly afterwards, PHA police arrived and ordered Plaintiff and his wife to go in their house. After the PHA police left, Hall's ex-husband returned and attempted to run Plaintiff over with his vehicle. Ms. Bennetech emailed Chief Bard to request that he take her family out of PHA's "vice" and allow Philadelphia Police to handle the issue. (Id. ¶¶ 52–54, 57–59.)

In November, Hall attempted to cut Plaintiff's water off, made multiple false reports of domestic violence as if she was Ms. Bennetech, called D.H.S. on Plaintiff, and began telling people that Plaintiff and Ms. Bennetech followed her daughter to school. (Id. ¶¶ 60–63.)

The situation escalated significantly on the evening of November 24, 2016. When Plaintiff and his wife came home, Hall's son came out and said, "yo you f[–-]ed with my mom's car?" Another of Hall's sons then approached, and the two sons repeatedly stabbed Plaintiff. Plaintiff suffered a concussion and broken finger and required multiple stitches and staples. Ms. Bennetch called 911, as did one of the neighbors. PHA police showed up, told Ms. Bennetech and neighbors

5

to "mind their f***ing business" and then took Hall and her children into their home without speaking to Ms. Bennetech. (Id. ¶¶ 65–66.)

Plaintiff subsequently went to the Philadelphia Police station, but the assigned detective declined to contact PHA to identify the attackers. The following Monday, Plaintiff and his wife sought help from City Hall, their Councilman at large, and Philadelphia Police. Although a staffer from the Councilman's office contacted PHA police, PHA police told her they could not discuss the issue because of the ongoing investigation. (Id. ¶¶ 67, 69.)

Throughout December, both Hall and the PHA continued to harass Plaintiff and his family on an almost daily basis. Finally, in January 2017, Hall was moved out of the PHA-owned home. PHA's Office of Audit and Compliance told Ms. Bennetech they would not investigate any complaints about PHA police from her or Plaintiff. (Id. ¶¶ 71–75, 77.)

## II. PROCEDURAL HISTORY

Plaintiff brought this action *pro se* on November 27, 2018, and filed an Amended Complaint on February 25, 2019. The Amended Complaint appears to set forth claims pursuant to 42 U.S.C. § 1983, alleging that Defendants Bard and Eskridge are liable under a state-created danger theory, and that PHA and the City of Philadelphia are liable for maintaining customs and policies that resulted in violations of Plaintiff's constitutional rights.

Defendants PHA, Bard, and Eskridge filed a Motion to Dismiss, and the City of Philadelphia filed a separate Motion to Dismiss. These Motions are now pending before me.

## III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his

6

'entitle[ment] to relief' requires more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and only a complaint that states a plausible claim for relief survives a motion to dismiss. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id. at 679.

The Court of Appeals has detailed a three-step process to determine whether a complaint meets the pleadings standard. Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014). First, the court outlines the elements a plaintiff must plead to state a claim for relief. Id. at 365. Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." Id. Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 679). The last step is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 556 U.S. at 679).

A prisoner's *pro se* complaint should be "held to less stringent standards than formal pleadings drafted by lawyers." United States ex rel. Walker v. Fayette Cnty., Pa., 599 F.2d 573, 575 (3d Cir. 1979) (citing Haines v. Kerner, 404 U.S. 519, 521 (1972)). The court must construe the facts stated in the complaint liberally in favor of the plaintiff. Haines, 404 U.S. at 520. "Yet there are limits to our procedural flexibility. For example, *pro se* litigants still must allege sufficient facts in their complaints to support a claim." Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013). Thus, even a *pro se* complaint must conform with the requirements of Rule 8(a) of the Federal Rules of Civil Procedure, which "demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation" or "naked assertions" that are devoid of "factual enhancement." Iqbal, 556 U.S. at 678 (internal quotations omitted). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' will not do." Id.

## IV. DISCUSSION

Defendants move—pursuant to Federal Rule of Civil Procedure 12(b)(6)—to dismiss all claims against them. In support of their Motions, Defendants set forth four arguments. First, Defendants PHA, Branville Bard, and Glenn Eskridge (collectively, the "PHA Defendants") allege that to the extent the § 1983 claims are predicated on the negligent investigation and/or prosecution of Hall and her family, the claims are not viable. Second, the PHA Defendants urge that Plaintiff cannot assert § 1983 claims against Bard and Eskridge under either exception to Deshaney v. Winnebago County Department of Social Services., 489 U.S. 189 (1989). Third, both Defendant City of Philadelphia and Defendant PHA contend that Plaintiff has failed to state a cognizable Monell claim. Finally, the PHA Defendants posit that Plaintiff cannot maintain a punitive damages claim against either PHA or Bard and Eskridge in their official capacities. I address each argument individually.

### A. Negligent Investigation Claims

The PHA Defendants first argue that to the extent Plaintiff's § 1983 claims are predicated on PHA's allegedly negligent investigation and/or failure to prosecute Hall, such claims are not legally viable.

Plaintiff responds that his claims are not based on either negligent investigation or failure to prosecute. Rather, he alleges that, by opening up an investigation, PHA police were able to defend Hall while simultaneously preventing Plaintiff and his family from accessing the services of the Philadelphia Police Department. As Plaintiff explains, the PHA police "did not simply fail to investigate or intervene[,] they intentionally placed themselves where they should not have been

8

and created a set of circumstances that fueled the violence eventually experienced by the plaintiff." (Pl.'s Resp. 2.) With respect to individual Defendants Eskridge and Bard, Plaintiff asserts that they are liable, not for failing to refer the case to the Philadelphia Police Department, but for engaging in a calculated effort to protect Hall and to ignore PHA's jurisdictional boundaries. (Id.)

In light of Plaintiff's representation that he does not seek relief based on negligent investigation, I decline to grant the PHA Defendants' Motion on this ground.

### B.  State-Created Danger

The PHA Defendants next seek dismissal of Plaintiff's claim that the individual Defendants violated Plaintiff's due process rights to bodily integrity by failing to protect him from violence inflicted by Hall and/or her family members. They assert that, under the Due Process Clause, a state actor may not be liable for failure to protect an individual against private violence.

"Individuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." Phillips v. Cty. of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008). Nonetheless, in DeShaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189 (1989), the United States Supreme Court made clear that the Due Process Clause does not impose an affirmative obligation on the state to protect its citizens from private actions unless one of two exceptions are met. Id. at 195–96.

The "state-created danger" theory operates as one of the exceptions to DeShaney.[3] Phillips, 515 F.3d at 235. Under this theory, "[w]hen the affirmative exercise of state authority either results

---

[3]  The other exception is the "special relationship" exception, which notes that the Constitution "imposes upon the State affirmative duties of care and protection with respect to particular individuals." DeShaney, 489 U.S. at 198 "That exception applies when a special relationship has been established because "the State takes a person into its custody and holds him there against his will." Id. at 199–200. "[T]he relationship between the state and its incarcerated or involuntarily committed citizens is the kind of 'special relationship' that creates an affirmative duty upon the state to provide adequate medical care to incarcerated prisoners . . . and to ensure the 'reasonable safety' of involuntarily committed mental patients." Morrow v. Balaski, 719 F.3d 160, 167 (3d Cir. 2013)

9

in a citizen's injury or leaves a citizen more vulnerable to injury at the hands of a third party, the government contravenes the substantive due process protections of the Fourteenth Amendment." D.N. and S.N. v. Snyder, 608 F. Supp. 2d 615, 624 (W.D. Pa. Mar. 31, 2009). In order to impose liability on the state actors, a plaintiff relying on this concept must prove: "(1) the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed." Phillips, 515 F.3d at 235 (citing Bright v. Westmoreland Cty, 443 F.3d 276, 281 (3d Cir. 2006)). A plaintiff must establish all four of these elements to prevail on such a theory. Smith v. School Dist. of Phila., Civ. A. No. 07–2080, 2009 WL 667455, at *3 (E.D. Pa. Mar. 10, 2009); Magwood v. French, 478 F. Supp. 2d 821, 828 (W.D. Pa. 2007).

Plaintiff posits that the PHA Defendants are liable under a state-created danger theory. The PHA Defendants counter that Plaintiff has not adequately pled facts sufficient to satisfy the first, second, and fourth elements of this test.

### 1. Element One – Foreseeable and "Fairly Direct" Harm

The first element of the state-created danger test requires that the harm ultimately caused was a foreseeable and a fairly direct result of the state's actions. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 908 (3d Cir. 1997). "A harm is foreseeable when a state actor has actual awareness, based on concrete information, of a risk of harm to an individual or class of individuals such that the actor is on notice that his or her act or failure to act significantly enhances that risk of

---

(quoting Estelle v. Gamble, 429 U.S. 97 (1976) and Youngberg v. Romeo, 457 U.S. 307, 324 (1982)).
  Here, Plaintiff does not attempt to, and clearly may not, proceed under the "special relationship" exception. Nothing in the Amended Complaint suggests that PHA affirmatively restrained Plaintiff's freedom to act on his own behalf. Accordingly, I decline to find, that the special relationship exception applies.

harm." Gremo v. Karlin, 363 F. Supp. 2d 771, 784 (E.D. Pa. 2005); see also D.N. and S.N. v. Snyder, No. 08-526, 2009 WL 824757, at *5 (M.D. Pa. Mar. 31, 2009). "Once the foreseeability element of the state-created danger test has been determined, the complaint must also allege that the attack or harm is a 'fairly direct' result of the defendant's acts." Phillips, 515 F.3d at 239. "Although this inquiry is unavoidably fact specific for each individual case, a distinction exists between harm that occurs to an identifiable or discrete individual under the circumstances and harm that occurs to a 'random' individual with no connection to the harm-causing party." Id.

The PHA Defendants aver that the Amended Complaint fails to allege foreseeable harm. They urge that up until the November 2016 attack, Plaintiff was subjected to only verbal harassment by Hall and her family members. They conclude that "the bodily injuries [Plaintiff] sustained at the hands of Hall's son were too attenuated from any of Moving Defendants' actions to a be a direct consequence thereof." (PHA Defs.' Mem. Supp. Mot. to Dismiss 13.)

Taking the allegations of the Amended Complaint as true, however, I find Plaintiff's allegations sufficient to survive Rule 12(b)(6) review. The Amended Complaint sets forth, in great detail, numerous aggressive actions by Hall and her family against Plaintiff and his family, including, among other things: smearing feces on Plaintiff's house (Am. Compl. ¶¶ 43, 52), pounding on Plaintiff's door and threatening to fight and/or kill Plaintiff and his wife (id. ¶ 41), attempting to run Plaintiff's wife over in a car (id. ¶ 57), and making up multiple false reports of domestic violence. (Id. ¶ 60–62.) Certainly, it was foreseeable that these ongoing threats and harassment would escalate to physical violence. Nonetheless, according to the Amended Complaint, PHA police repeatedly failed to assist Plaintiff, and, in fact, emboldened Hall both by harassing Plaintiff themselves and by precluding Philadelphia Police from acting. (Id. ¶¶ 23–30, 34–37, 43, 49–50, 52–54, 58–59, 65–66.) Based on these facts, Plaintiff posits that:

11

> The state actors used their authority to create an opportunity that otherwise would not have existed for the third parties crime to occur, P.H.A Police assisted Miss Hall and her family in getting away with crimes against [Plaintiff] multiple times. P.H.A. Police created an environment where Miss Hall and her children were confident that they could harm Gerald and not be held accountable. P.H.A. Police did not simply not assist [Plaintiff,] they placed [Plaintiff] in a position where he had no one to turn to but P.H.A. Police and then they demonstrated numerous times that they would protect Miss Hall and her family from being held accountable for any act she committed against [Plaintiff].

(Id. ¶ 85.)

Such allegations create the plausible inference that the harm suffered by Plaintiff was both reasonably foreseeable to the PHA Defendants and a direct consequence of their actions. As such, I find this element to be adequately pled.

### 2. Deliberate Indifference/Conscience-Shocking Conduct

The second prong of the state-created danger test asks whether the state actors' actions "shock the conscience." The level of culpability required for behavior to shock the conscience largely depends on the context in which the action takes place. L.R. v. Sch. Dist. of Phila., 836 F.3d 235, 246 (3d Cir. 2016); see also Patrick v. Great Valley Sch. Dist., 296 F. App'x 258, 261 n.3 (3d Cir. 2008) ("Whether a state actor's conduct shocks the conscience depends on the particular factual circumstances, and cannot be determined by reference to an inflexible standard."). "In a 'hyperpressurized environment,' such as a high-speed police chase, intent to harm is required." L.R., 836 F.2d at 246. But where "deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient." Id. Deliberate indifference merely requires a "conscious disregard of a substantial risk of serious harm." Vargas v. City of Philadelphia, 783 F.3d 962, 973–74 (3d Cir. 2015) (quotations omitted). That is, "deliberate indifference might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known." Phillips, 515 F.3d at 241 (quotation omitted).

The PHA Defendants contend that "the Amended Complaint fails to allege any action that amount[s] to the kind of 'conscience shocking' behavior that could sustain a state-created danger claim." (PHA Defs.' Mem. Supp. Mot. to Dismiss 13.) They go on to argue that "[a]t best, Plaintiff complains of an imperfect, negligent police investigation." (Id. at 13–14.)

A plain reading of the Amended Complaint, however, undermines the PHA Defendants' argument for two reasons. Primarily, the events described in the Amended Complaint do not indicate that the PHA Defendants faced a "hyperpressurized environment" requiring quick decisions. Rather, the events occurred over an extended period of time, allowing the PHA Defendants to make "unhurried judgments." As such, a deliberate indifference standard—not a shock-the-conscience standard—applies.

Moreover, as asserted by Plaintiff, the claims are premised on the PHA Defendants' alleged calculated efforts to protect Hall and preclude Plaintiff from obtaining the help of the Philadelphia Police Department. The Amended Complaint specifically contends that Chief Bard of the PHA (a) used his prior relationship with the Philadelphia Police to ensure that the Philadelphia Police did not provide services to Plaintiff regarding any matters with Hall, and (b) permitted the PHA Police to be utilized as "[a] tool to assist [Hall] in harassing [Plaintiff] and his family and to protect the tenant." (Am. Compl. ¶¶ 28, 30.) The Amended Complaint further alleges that Sgt. Eskridge opened an investigation into the situation, but by doing so, created a scenario wherein the investigation precluded the Philadelphia Police Department from acting. (Id. ¶¶ 34, 52, 54.) In support of these allegations, the Amended Complaint recounts multiple incidents in which PHA police were called to the scene, but they repeatedly refused to address the situation or even speak with Plaintiff and his family. (Id. ¶ 53.) Such actions clearly give rise to an inference of, at minimum, deliberate indifference and, at best, conscience-shocking behavior. Accordingly, I find that Plaintiff has adequately pled the second element of the state-created danger test.

### 3. Relationship Between Plaintiff and Defendants

Although the PHA Defendants do not explicitly dispute the third element, a brief discussion of it is warranted.

The third element of the state-created danger test "inquires whether there existed some relationship between the state and the plaintiff." Rivas v. City of Passaic, 365 F.3d 181, 197 (3d Cir. 2004). This relationship need not rise to the level of the "relationship" in the "special relationship" exception to DeShaney. Brown v. Commonw. of Pa. Dept. of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 479 (3d Cir. 2003). Rather, "[t]he relationship requirement under the state-created danger theory contemplates a degree of contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense." Kneipp v. Teder, 95 F.3d 1199, 1209 n.22 (3d Cir. 1996). The relationship must be sufficiently close to exclude "those instances where the state actor creates only a threat to the general population," but not so restrictive as to limit "the scope of § 1983 to those instances where a specific individual is placed in danger." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 913 (3d Cir. 1997). More succinctly, the plaintiff must be "a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." Id.; see also Rivas, 365 F.3d at 197 (holding that a jury could find a "relationship" existed where defendants were EMTs responding to a call to plaintiff's house and the purpose of their visit was to provide medical care to the plaintiff and to reduce the amount of danger in which he found himself as a result of his seizure). The touchstone of this element is whether the plaintiff was a foreseeable victim of the defendants' acts in a tort sense. Morse, 132 F.3d at 912.

Here, the allegations of the Amended Complaint allow for the plausible inference that Plaintiff was a member of a "discrete class" of individuals subjected to a potential harm caused by the PHA Defendants' actions. The PHA police were repeatedly called to Plaintiff's home for the purpose of managing an escalating and potentially violent neighbor dispute. Plaintiff specifically

met with Chief Bard and Sgt. Eskridge, both of whom were allegedly responsible for the PHA's actions. (Am. Compl. ¶¶ 28–34.) According to the Amended Complaint, Plaintiff kept reporting the problem to both Bard and Eskridge, yet they repeatedly ignored Plaintiff's pleas, while taking steps to independently harass Plaintiff and condone the actions of Hall. Certainly, such circumstances render Plaintiff a foreseeable victim for purposes of a state-created danger theory.

### 4. Affirmative Action

The last element inquires whether the state actor used his or her authority to create an opportunity, which otherwise would not have existed, for the specific harm to occur. Rivas, 365 F.3d at 197. Under this element, liability is predicated on the state actor's affirmative acts which worked to the plaintiff's detriment—*i.e.*, misuse of state authority, rather than a failure to use it. Bright v. Westmoreland Cty., 443 F.3d 276, 282 (3d Cir. 2006). Moreover, there must be a "direct causal relationship between the affirmative act of the state and the plaintiff's harm. Only then will the affirmative act render the plaintiff 'more vulnerable to danger than had the state not acted at all.'" Kaucher v. County of Bucks, 455 F.3d 418, 432 (3d Cir. 2006).

The PHA Defendants posit that "the facts, as alleged, simply do not support Plaintiff's allegations that the actions taken by Moving Defendants increased the risk of danger to Plaintiff and his family or rendered him more vulnerable to danger than had they not initiated an investigation at all." (PHA Defs.' Mem. Supp. Mot. to Dismiss 14.) As such, they conclude that Plaintiff has not pled sufficient facts to support the fourth element of the state-created danger test.

Applying Twombly/Iqbal standards, I disagree. According to the Amended Complaint, Plaintiff, despite not being a PHA tenant, was forced to deal with PHA police because their dispute arose with Hall, who was a PHA tenant. The Amended Complaint then asserts that the PHA, acting on instructions from Chief Bard and Sgt. Eskridge, opened an "investigation" into the situation between Plaintiff and Hall and, by doing so, deprived the Philadelphia Police Department of

15

jurisdiction to act. The PHA Defendants also created a situation wherein PHA would consistently intervene on Hall's behalf and protect her from accountability. These facts give rise to a reasonable inference that, had PHA not intervened and had Hall not known she would be repeatedly exonerated by the PHA Defendants, she would not have progressed from intermittent verbal abuse to a multi-month campaign of harassment culminating in a stabbing. (Am. Compl. ¶ 83; see also id. ¶ 85 ("P.H.A. Police created an environment where Miss Hall and her children were confident that they could harm [Plaintiff] and not be held accountable. P.H.A. Police did not simply not assist [Plaintiff,] they placed [Plaintiff] in a position where he had no one to turn to but P.H.A. Police and then demonstrated numerous times that they would protect Miss Hall and her family from being held accountable for any act she committed against [Plaintiff].")

5. Conclusion as to State-Created Danger Theory

In short, the Amended Complaint sets forth a significant number of detailed allegations regarding the events at issue. Taking such allegations as true, I find that all elements of the state-created danger theory satisfy well-settled pleading standards. Therefore, at this juncture, I decline to dismiss this claim against the PHA Defendants.

C. *Monell* **Claim Against the City of Philadelphia and PHA**

Both the PHA Defendants and Defendant City of Philadelphia next seek to dismiss the Monell claims against them. I decline to do so.

In order to recover against a municipality or municipal corporation[4] under § 1983, a plaintiff must plead that the City itself caused an injury through the implementation of a policy, practice or custom. Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 694 (1978); Natale v. Camden Cty

---

[4] As a public housing authority, the PHA is considered a municipal corporation for the purposes of § 1983. Wright v. Phila. Hous. Auth., No. 94–1601, 1994 WL 597716, at *3 (E.D.Pa. Nov. 1, 1994).

Corr. Facility, 318 F.3d 575 (3d Cir. 2003).  Section 1983 imposes liability on a municipality where, "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original).  The Third Circuit has recognized liability for local governments in three circumstances:

> First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity; . . . second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy; . . . third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes.

McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005) (internal citations omitted).  A plaintiff must prove that the action in question, conducted pursuant to official municipal policy, caused his/her injury.  Connick v. Thompson, 563 U.S. 51, 60–61 (2011).

The City of Philadelphia has moved to dismiss the Monell claims against it, alleging, in cursory fashion, that "Plaintiff makes no allegations regarding a policy or custom involving to [sic] the City.  Instead, Plaintiff has limited his complaint to averments regarding his own personal situation."  (Def. City's Mem. Supp. Mot. to Dismiss 2.)

This argument fails to acknowledge the Amended Complaint's explicit assertion that the City maintains "a policy that allows P.H.A. Police to be on Philadelphia Police radios" and a custom by Philadelphia Police "to allow P.H.A. Police to act as if P.H.A. Police have unlimited jurisdiction." (Am. Compl. ¶¶ 78–79.)  Plaintiff has set forth more than sufficient factual allegations to plausibly plead that this policy was the direct cause of many of his injuries because he was unable to obtain the assistance of the Philadelphia Police in handling the dispute with Hall.  Accordingly, dismissal of the Monell claim against the City is not appropriate at this early stage of the litigation.

17

Similarly, the PHA seeks dismissal of the Monell claim against it because Plaintiff has not alleged that a PHA custom or policy was the moving force behind the alleged violation of his due process rights. It reasons that a mere allegation that PHA has a custom of assuming "unlimited jurisdiction" over issues between PHA tenants and non-PHA homeowners is nothing more than boilerplate language that is too vague and ambiguous to properly state a claim. They further contend that Plaintiff has not alleged how any such customs were the "moving force" behind the alleged due process deprivations.

Contrary to the PHA's argument, however, Plaintiff's Monell claim against PHA is far more than "boilerplate." Plaintiff directly alleges that PHA maintains the following customs and policies:

> 77. P.H.A. Police have a custom in which they place themselves in the middle of issues between tenants and homeowners by holding a mediation handled by P.H.A. which leads to P.H.A investigations.
>
> 78. P.H.A Police and Philadelphia Police have a policy that allows P.H.A Police to be on Philadelphia Police radios. This allows for the type of situation that [Plaintiff] ended up in.
>
> 79. It is a custom of P.H.A and Philadelphia Police to allow P.H.A Police to act as if P.H.A Police have unlimited jurisdiction.

(Am. Compl. ¶¶ 77–79.) The Amended Complaint then goes on to plead that the harm from these policies was foreseeable and direct as these policies allowed Ms. Hall to rest assured that she would not be held accountable and that PHA police would protect her. These policies further precluded the Philadelphia Police Department from stepping in to mitigate the situation. (Id. ¶ 82–83.)

Liberally construing Plaintiff's claims in the light most favorable to him, I find that Plaintiff's Monell claim against PHA satisfies Twombly/Iqbal pleading standards. I therefore decline to dismiss this claim at the Rule 12(b)(6) stage.

### D. Punitive Damages

In their final argument, the PHA Defendants contend that Plaintiff's claim for punitive damages should be stricken against Defendant PHA and against Defendants Bard and Eskridge in their official capacities.

It is well established that punitive damages are not available against a municipal defendant a civil rights action. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 266 (1981). Similarly, punitive damages cannot be recovered from defendants in their official capacities. Gregory v. Chehi, 843 F.2d 111, 119–20 (3d Cir. 1988). Given this well-settled law, I will dismiss Plaintiff's claim for punitive damages against both Defendant PHA and against the individual Defendants in their official capacities.

### V. CONCLUSION

In light of the foregoing, I will grant the PHA Defendants' Motion to Dismiss to the extent it seeks dismissal of the punitive damages claim against the PHA and Defendants Bard and Eskridge in their official capacities. In all other respects, I will deny both Motions to Dismiss. An appropriate Order follows.